IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BIS ADVANCED SOFTWARE SYSTEMS, LTD.,<br><br>    Plaintiff,<br><br>    v.<br><br>RED BEND SOFTWARE, INC.,<br>RED BEND, LTD.,<br>TIME WARNER INC.,<br>ICQ, INC.<br>INSTALLSHIELD SOFTWARE CORP.,<br>and<br>SCANSOFT, INC.<br><br>    Defendants. | Civil Action No. 04cv11960 (RWZ) |

## OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY

Defendants Red Bend Software, Inc. Red Bend, Ltd., ICQ, Inc., and Installshield Software Corp. (collectively "Defendants")[1] submit this brief in Opposition to Plaintiff's Motion to Compel Discovery.

Plaintiff's motion is one to compel documents from a company that has none (Installshield), to compel interrogatory answers where defendants had previously agreed to supply such answers, to compel a defendant (ICQ) to produce documents claiming it had produced no documents when in fact it had, and to compel reproduction of duplicate copies of documents.

Procedurally, plaintiff failed to properly conference this motion as required by Rule 37 Fed. R. Civ. P. and Local Rule 7.1. As discussed in more detail below, some issues were never raised in any discovery conference, and others, if mentioned, were not adequately conferenced.

---

[1]    Defendants note that BIS has stipulated to the dismissal of defendants Time Warner, Inc. and Scansoft, Inc.

In short, plaintiff's motion – filed simultaneously with two other motions of dubious merit in what Defendants believe is a further attempt by plaintiff to delay while seeking to shift blame for its delay to Defendants – should be denied both on the merits and in light of the procedural failings.

## BACKGROUND

Some background is necessary to put plaintiff's motion in context. As the Court is aware, a scheduling conference took place on January 27, 2005. Both sides served written discovery in early March.

On March 31, 2005, Defendants' counsel conferred with plaintiff's counsel about the discovery schedule. *See* Ex. A (March 31, 2005 e-mail from Mr. Horwitz to Ms. Lhommedieu). The parties outlined a detailed discovery plan, including establishing rough dates for completion of document production, and scheduling two weeks of depositions of Red Bend and BIS witnesses in Israel during the end of July.[2] *See id.*

There was also an informal understanding that the parties were to try to produce the important documents first. In particular, BIS advised it wanted copies of Red Bend's source code in order to further explore its infringement allegations and BIS wanted the license agreements and financials to explore damages. As a result, on May 16, 2005, Red Bend made an initial production of the requested source code, as well as license agreements and certain financials. *See* Ex. B (May 16, 2005 letter from Ms. Fernands to Ms. Lhommedieu). To expedite matters, Red Bend also made this production of its highly confidential commercially

---

[2] The parties further agreed to seek a two-month extension of the then-existing discovery deadlines, a request that was granted by the Court on April 26, 2005. Additional, brief, extensions of the deadlines for responding to written discovery were later extended.

sensitive source code prior to entry of the parties' proposed Stipulated Protective Order by the Court. *See* D.I. 31.

Red Bend had largely completed its production by the end of June; it produced 2,362 additional pages of documents on July 12, 2005. *See* Ex. C (July 12, 2005 letter from Mr. Danielson to Mr. Fink). By that time, among other efforts, two Red Bend attorneys had gone to Red Bend's facilities in Israel and the United States and to ICQ's facilities in Israel, and Red Bend and ICQ had gathered paper and electronic documents. In all, Red Bend had produced about 100,000 pages of documents, including the equivalent of 65,000 pages of source code. *See generally* Danielson Declaration.

Red Bend has also informed BIS that, with the exception of about 100 documents believed to contain third-party confidential information discussed below, Red Bend's production is largely complete.[3] With respect to the third-party confidential documents, Red Bend has notified its customers of BIS's requests and Red Bend is prepared to produce non-objectionable, responsive third-party information pursuant to the Protective Order upon the Court's entry of that order. The only other documents that had not been produced were a small collection of about 70 documents recently determined to be non-privileged and responsive. These documents were produced on August 18, 2005. *See* Ex. D (August 18, 2005 letter from Mr. Danielson to Ms. Lhommedieu).

As part of the informal understanding that the important documents would be produced quickly, Red Bend identified the plaintiff's documents of interest to it as documents relating to the creation of inventions and the documents by which Red Bend could understand the

---

[3] Defendants reserves the right to supplement its production as appropriate. Defendants further note, in particular, that their investigation into prior art is ongoing and that additional prior art references, or other materials disclosed in that investigation, may be produced during the course of discovery.

functionality of the product which was the precursor to the invention – to date, these documents have not been produced. By the end of June, BIS had produced only 1,426 pages of documents, the vast majority of which were from the publicly available prosecution history file. *See* Exs. E-F (May 19, 2005 letter from Ms. Fernands to Ms. Lhommedieu; June 2, 2005 e-mail from Ms. Fernands to Ms. Lhommedieu).

Upon reviewing the production, Red Bend pointed out to plaintiff's attorneys certain specifics of the failure to properly produce. *See, e.g.,* Ex. G (June 21 e-mail from Fernands to Ms. Lhommedieu). Plaintiff made numerous representations that the documents pointed out as missing did not exist and that a "complete" production had been made. On June 27, 2005 defendants were compelled to serve a 30(b)(6) Notice of Deposition regarding the documents that existed and the production. *See* Ex. H.

Then, from July 7, 2005 through July 13, 2005, two to three weeks before the scheduled depositions in Israel, plaintiff produced more than 15,000 additional pages of documents. *See* Ex. I (series of letters from Mr. Fink to Ms. Fernands dated July 7, July 8, July 11, July 12 and July 13). The additional production included many drafts of agreements in Hebrew and some information on the sale of the precursor product, but little information on its functionality and no documents on the creation of the invention in issue.

While a complete list of plaintiff's documents that have not been produced must await a deposition, Red Bend identified to plaintiff the fact that at least the following documents are still missing:

(1) financial documents showing, for each license plaintiff produced, the monies received or paid for that license;

4

(2) documents reflecting the creation, testing and implementation of the invention in issue;

(3) documents showing the functionality of the product which was the precursor to the invention; and

(4) historic versions of plaintiff's software or source code embodying the invention claimed in plaintiff's patent.

In short, (2) – (4) are the very documents Red Bend identified as the important ones it wanted to see as soon as possible, and (1) is documents required to assess damages.

Then, on Friday, July 15, 2005, barely a week before defendants' counsel was scheduled to leave for the two weeks of depositions in Israel that the parties had agreed upon, plaintiff's counsel unilaterally canceled the depositions, claiming a lack of discovery by defendant. *See* Ex. J (July 15 e-mail from Mr. Fink to Ms. Fernands). Not only did defendants object to the cancellation of the substantive depositions, but pointed out that there was no basis at all for the cancellation of the 30(b)(6) deposition on documents which should go forward in any event. *See* Ex. K (July 18 letter from Mr. Horwitz to Mr. Fink). Plaintiff refused to proceed even with that deposition.

Now, having delayed and derailed discovery, BIS seeks to shift the blame to defendants. However, there is no merit to the complaints made in BIS's motion to compel.

## ARGUMENT

In its Brief, BIS's complaints about the Defendants' discovery responses fall into four broad categories: (1) Interrogatory responses from both Red Bend and ICQ; (2) Red Bend's written responses to document requests, in particular the statement that it will produce "representative documents" and Red Bend's reference to and refusal to violate confidentiality

obligations to third parties; (3) ICQ's Document Response; and (4) Installshield's discovery responses. Each is addressed below.

## I.        Answers To Interrogatories – Red Bend, Ltd., Red Bend Software, Inc. and ICQ.

BIS seeks to compel further responses to Interrogatories 6-11 from both Red Bend entities as well as ICQ; and also to compel answers by ICQ to Interrogatories 4, 5 and 6.

As BIS notes (BIS Brief at 11), however, Red Bend had already agreed to provide supplemental responses to these Interrogatories 6-11, but simply had not yet provided them at the time BIS decided to file its Motion to Compel. The only conversations between the parties about this issue was a representation by Red Bend that, now that documents had been produced, it would amend the answers. As to the date by which this would be done, Red Bend advised that, while it had most of the information already, it needed a week or two of more time. In fact, such time was needed for Red Bend's Chief Technical Officer to return from vacation so that he could ensure the information was complete.

Red Bend, Ltd. and Red Bend Software Inc. have – as represented – now served supplemental responses and believe that BIS's Motion to Compel further responses is moot.

Based on BIS's Brief, it is clear that BIS does not think that Red Bend should be allowed to rely on Rule 33(d). This is in contrast to its previous position that Red Bend could answer interrogatories by identifying specific documents. *See* Ex. L (June 30, 2005 e-mail from Ms. Lhommedieu to Ms. Fernands). In addition, Rule 33(d) Fed. R. Civ. P. itself is quite clear in stating that a party has the option of specifying records from which an interrogatory answer can be derived. In Red Bend's supplemental responses, in addition to providing certain, additional, specific information, Red Bend identifies by Bates numbers the documents from which other answers may be derived. At the time of Red Bend's earlier responses to plaintiff's

6

interrogatories, the documents had not yet been produced, so Red Bend could not provide this specific Bates number identification.

The amended responses to Interrogatories are attached (Ex. Q), but are summarized as follows.

Interrogatory No. 6: Version of Software Released: Red Bend has identified (by Bates Nos.) the specific versions by referring to the software produced and the release dates by identifying documents showing distribution.[4]

Interrogatory No. 7: Identify Customers and Potential Customers: Red Bend has identified (by Bates Nos.) a document listing all customers as well as correspondence and documents relating to potential customers.

Interrogatory No. 8: Identify Sales Data and Forecasts: Red Bend has identified (by Bates Nos.) a document listing all monies received and by whom as well as supporting documents and documents showing business projections.

Interrogatory No. 9: Identify All Agreements: Red Bend has identified (by Bates Nos.) all such agreements.

Interrogatory No. 10: Identify Facts Relating to Affirmative Defense and Counterclaims: Despite the fact that Red Bend did not have proper discovery from plaintiff, Red Bend identified a 12-page series of letters it sent to plaintiff laying out its defenses and counterclaims in detail. Obviously, as plaintiff properly complies with discovery this will be updated.

Interrogatory No. 11: Identify and Analyze Relevant Prior Art: Red Bend has identified (by Bates Nos.) the prior art it produced. As to the detailed analysis, Red Bend pointed out that

---

[4] Because "release" is a term that has many meanings, Red Bend pointed to the documents which explained the facts of what happened instead of characterizing those facts.

the search and analysis was ongoing and not complete. Further, aside from this interrogatory being unduly burdensome, this is the province of the expert and expert reports are not yet due.

As to ICQ, BIS also seeks to compel further responses on these same interrogatories from ICQ. Initially, BIS has never raised any specific concerns about ICQ's interrogatory responses in any discovery conference. Second, BIS's motion as to ICQ should be denied on the separate and distinct ground that the discovery sought from ICQ is "unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(i).

BIS also separately identifies three Interrogatories, Nos. 4, 5 and 6, and argues that it is entitled to more complete responses from ICQ as to these requests. Once again, ICQ notes that BIS has never conferenced these issues. More importantly, however, it is evident from the face of these Interrogatories that they are overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. *See* Interrogatories and Responses, reproduced on pages 11-12 of BIS's Brief.

<u>Interrogatory No. 4</u> reads:

> Provide ***any and all information necessary to access any and all source code files from the media upon which they were produced and to recreate the entire executable program, software or system from scratch using the source code provided,*** including but not limited to: manufacturer, model, and configuration of the computer system upon which the information was created and managed; manufacturer, name, and version number of the operating system under which the information was created and managed; the manufacturer, program name, and version number of the software used to create and manage the information; the manufacturer and model number of the hardware device on which the media was placed to write the information being produced; the manufacturer, program name, version number, and specific operational parameters used with the software that was employed to write the information to the media being produced, ***and any other***

> *information that a person of the art would use to create, write, and produce such information.*

BIS's Interrogatory No. 4 to ICQ (emphasis added). Read literally, this Interrogatory requests ICQ provide a vast array of information, including such things as identification of all publicly available manuals and articles on the programming language in which the software was written; a mountain of information. In fact, what is reasonable here and not unduly burdensome is for defendants to supply plaintiff with whatever is required for someone skilled in computing to understand how the accused software functions.

The best proof that defendants have supplied this required information is that plaintiff's attorneys claim to be skilled in computing (Ms. Lhommedieu, for example, lists her work experience as: "For several years, she worked in various computer hardware, software and networking firms." www.gbpatent.com) and plaintiff's attorneys have had the source code since May 16, 2005 and never once asked for any additional information they needed from Red Bend to understand the code.

Interrogatory No. 5: Details of how ICQ's attorneys searched for documents: This is the subject of attorney-client and work-product privilege. Plaintiff states only that this objection is not valid but rather a "form" objection. Yet, plaintiff makes no analysis of why the objection is not valid.

Interrogatory No. 6: Versions and Releases of Code: BIS *concedes* that the discovery it seeks from ICQ, Red Bend's customer, is "seemingly duplicative of requests made to other defendants," such as Red Bend. BIS's Brief at 12. In an attempt to justify its request, BIS asserts, without explanation, that it is entitled to responses to the requested, admittedly duplicative questions in order "to compare all the responses, and for calculation of damages." BIS's Brief at 12. Defendants are not aware of, and BIS does not cite, authority supporting the

9

proposition that BIS may seek burdensome duplicative discovery in order to compare the defendants responses. Defendants are also not aware, and BIS fails to explain, why BIS requires ICQ's responses for calculation of damages.[5]

In addition, as set forth in more detail below, there is no basis for BIS's insistence that ICQ produce a separate copy of the source code for Red Bend's software products, particularly where Red Bend has already produced multiple versions of that source code to BIS.

**II.   Document Responses**

As detailed above and in the accompanying Declaration of Miguel Danielson, Red Bend conducted a thorough document review resulting in a substantial production. Notably, BIS has only two complaints about the Red Bend production: (1) the fact that Red Bend agreed to produce "representative documents;" and (2) the fact that Red Bend has not yet produced documents that may contain information that is confidential to a third party and the subject of a non-disclosure agreement.[6]

With respect to the first issue, the "representative documents," Red Bend first notes that this is another issue that was not discussed at any discovery conference. What Red Bend meant by "representative documents," was that Red Bend did not produce purely duplicative copies of documents that appear multiple times in either hard copy or electronic form. Additionally, Red Bend produced only representative documents in the case of computer testing output files, which consist of large spreadsheets of numerical data and for which many thousands of such files, each many pages in length, exist.

---

[5]   See page 10 of Opposition to Plaintiff's Motion to Amend the Complaint.

[6]   BIS also complains about defendants' having "only recently produced a privilege log" (BIS's Brief at 3); yet Red Bend's privilege log was served on BIS on the same day that BIS served its log on defendants.

10

With respect to the duplicate materials, for example, when preparing e-mails (electronically) for production, Red Bend "deduped" the e-mails, that is, Red Bend ran a program intended to remove multiple, **identical** duplicates of e-mails where the same e-mail was sent to numerous people and appeared in multiple electronic mail boxes. This program did **not** eliminate responses to that e-mail or different versions of the e-mail, only exact duplicates. Another example is promotional materials, such as multiple copies of a brochure; Red Bend chose to produce one "representative" copy rather than photocopying each of a pile of identical brochures.

With respect to third party documents, Red Bend has about 100 documents that contain information which it is contractually obligated to keep confidential. Red Bend has notified the third parties involved that it wishes to release these documents, but quite understandably, the third parties who have responded have advised that without entry of the Protective Order by the Court,[7] they are not prepared to agree to have Red Bend produce these documents. Although parties can agree to proceed without Court endorsement of proposed Stipulated Protective Order, Red Bend does not expect third parties to do the same.

Red Bend has also notified the third parties of this motion and that, if they object to producing the documents, they must appear and explain to the court why. Red Bend does not expect any of the third parties to object as long as the Protective Order is entered.

Plaintiff also complains about the other defendants, that they did not produce duplicative documents that were produced by Red Bend. This is a patent infringement action. The products that BIS accuses of infringement are Red Bend's software products, and the only allegations as to any of the other defendants concern their use of Red Bend's products. Accordingly, to the

---

[7] Although the Protective Order was agreed to by both parties, it has not been entered by the Court.

11

extent BIS seeks discovery relevant to its infringement allegations, such as descriptions of functionality and source code for the accused products, Red Bend is the best source of that information. Likewise, to the extent that BIS seeks discovery relevant to any theory of damages, Red Bend is again the best source.

The Federal Rules of Civil Procedure expressly recognize that where, as here, "the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive" then it should be limited. Fed. R. Civ. P. 26(b)(2)(i). The Rules further provide that discovery may be limited where "the burden or expense of the proposed discovery outweighs its likely benefit . . ." Fed. R. Civ. P. 26(b)(2)(iii). BIS repeatedly claims that, although its discovery requests are "seemingly duplicative," it is entitled to production of such duplicative information, without regard to the cost or inconvenience to defendants. *See, e.g.,* BIS's Brief at 12.

BIS asks this Court to compel Red Bend, and certain of Red Bend's customers, to provide further responses to BIS's duplicative and burdensome discovery requests simply because BIS asserts that it is entitled to the information. Notably absent from BIS's Brief, however, is any explanation as to why the defendants' legitimate objections should be ignored and why Red Bend and each of the other defendants should be put through the business disruption and expense of gathering copies of the same documents and answering the same or similar questions. In light of the duplicative nature of BIS's requests, alone, its motion should be denied.

### III.    ICQ's Documents

BIS claims that ICQ, Inc. has "failed to produce any documents in response to Plaintiff's requests for production." *See* BIS's Brief at 3(3). This is blatantly incorrect. As detailed in Mr.

12

Danielson's declaration, documents were gathered and produced from ICQ. Specifically, on June 29, 2005, a CD-Rom containing such documents was produced to BIS. *See* Ex. M (June 29, 2005 letter from Mr. Danielson to Ms. Lhommedieu with FedEx confirmation). BIS has never spoken to defendants about any perceived deficiency in this ICQ production.

In its rush to make a motion, plaintiff did not even wait to do a proper investigation to see that it did in fact have an ICQ document production. It also did not wait long enough to discuss this issue with defendants, who could have pointed to the production.[8]

### IV.   Installshield Materials

Finally, BIS insists that it is entitled to information and materials from an empty shell. As shown in the Declaration of Tyler Sheffield (submitted herewith), Installshield has no documents and no employees, let alone employees with knowledge of any facts. Plaintiff argues without support that third parties should step in and voluntarily respond; there is a reason plaintiff can find no support for this position.

### V.   BIS's Failure to Confer

BIS's motion should also be denied for failure to confer "in an effort to secure the disclosure without court action." In the certification attached to its motion, BIS asserts that the parties conferred on August 1, 2005. As described above, that conference did not cover a multitude of issues.

Upon receipt of the motions, defendant wrote to plaintiff pointing out the failure to properly conference the issues and requesting that plaintiff withdraw the motions so a proper conference could be had. *See* Ex. N (August 8, 2005 letter from Ms. Fernands to Ms.

---

[8]   Although plaintiff raised issues concerning ICQ in much earlier discovery conferences, those discussions about ICQ concerned when ICQ would produce documents – a question that was answered on June 29 when a CD-Rom containing documents from ICQ was sent to BIS. Ex. M.

13

Lhommedieu). This letter was **not** sent to the Court because it was believed that it would be easier to resolve the issues without plaintiff's concern that the Court would think it had withdrawn the motions under pressure of the letter.

Instead of withdrawing the motions – instead of even calling to see what could be resolved – plaintiff filed a new Local Rule 7.1(A)(2) certificate in connection with its motion to amend the scheduling order. *See* Ex. O (August 9 letter from Mr. McConchie to Mr. Johnson).[9] Yet, defendants were not writing about form – they were writing about substance when they notified plaintiff of its failure to comply with the rules. There had never been a proper conference and issues were before this Court that could have been resolved.

## VI.   Conclusion

The best defense is a good offense…or so the plaintiff evidently believes. In taking the offensive, with three motions filed August 5, 2005, plaintiff continues its efforts to avoid producing a 30(b)(6) witness who will expose its failure to properly comply with discovery. In making these motions, plaintiff studiously avoided properly conferencing them pursuant to Rule 37 Fed. R. Civ. P. and Local Rule 7.1 because it realized that such a conference would eliminate the need for most of these motions and not give it the excuse to further postpone discovery.

Plaintiff filed a motion to extend the Scheduling Order. The parties could have agreed to that motion, but plaintiff was unwilling to timely produce a witness for deposition on its document production – a deposition that had long been scheduled and which plaintiff unilaterally cancelled.

Plaintiff filed a motion to add defendants. Plaintiff had known about these defendants all along and represented to the Court that they would not be added because they would not assist in

---

[9]   Plaintiff also offered to withdraw the motion to compel if defendant would not only concede it but would also pay attorneys fees. *See* Ex. P (August 9 letter from Ms. Lhommedieu to Ms. Fernands).

14

the action and would protract the action and make it more expensive.  Yet, when settlement negotiations broke down, plaintiff started threatening these customers and when threats did not work, plaintiff made this motion.

And plaintiff filed this motion to compel.  Not only is the substance of this motion frivolous, but plaintiff failed to adequately conference it, in violation of the rules of Civil Procedure.  By contrast, plaintiff's failure to produce is very real and goes to the substance of this case – defendants do not have essential documents such as the financials of licenses which may be argued as a measure of damages and the documents from the creation, implementation and testing of the invention in issue and its precursor.  Defendants need the quick deposition of a 30(b)(6) witness on documents so it can compel plaintiff to properly produce or file an appropriate motion for the Court to compel production.

In short, plaintiff is attempting to avoid proper discovery while making a motion to compel in the hopes that this Court will look at this case as one in which both sides are at fault for squabbling about discovery.  And while all this is happening, plaintiff gets to harass Red Bend's customers.

15

It is respectfully requested that, in addition to denying plaintiff's motion, the Court award attorneys' fees to defendants pursuant to Fed. R. Civ. P. 37(a)(4)(B).

**RED BEND SOFTWARE, INC., RED BEND, LTD., ICQ, INC. and INSTALLSHIELD SOFTWARE CORP.**

/s/ Brenda R. Sharton
Brenda R. Sharton (BBO # 556909)
Miguel C. Danielson (BBO # 651288)
GOODWIN PROCTER LLP
53 State Street
Boston, MA 02109
Tel:  617-570-1000
Fax:  617-523-1231

Ethan Horwitz (*pro hac vice*)
Anastasia Fernands (BBO# 633131)
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, New York 10022
Tel:  212-813-8800
Fax:  212-353-3555

Dated:  August 19, 2005