IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BIS ADVANCED SOFTWARE SYSTEMS,
LTD,

        Plaintiff,

   v.

RED BEND SOFTWARE, INC., ET AL,

        Defendants.

Civil Action No. 04-11960-RWZ

## AFFIDAVIT OF SCOTT McCONCHIE

Scott McConchie, upon oath, deposes and says as follows:

1.     I am one of the attorneys representing the plaintiff, BIS Advanced Software Systems, Ltd., in the above-captioned action. I am a member in good standing of the bars of the Commonwealth of Massachusetts and this Court.

2.     This affidavit is submitted in support of Plaintiff's Opposition to Defendants' Motion to Compel, filed herewith.

3.     Attached hereto as Exhibit A is a true copy of excerpts from the transcript of the deposition of Mr. Daniel Glazman, which was taken September 20, 2005.

Signed under the penalties of perjury this 3rd day of November, 2005.

        /s/ Scott McConchie
        Scott McConchie

COPY

CONFIDENTIAL

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

————————————————— x

BIS ADVANCED SOFTWARE SYSTEMS,  :

LTD.,                          :

              Plaintiff,     : Civil Action No.

v.                             : 04cv11960(RWZ)

RED BEND SOFTWARE, INC.,       :

RED BEND, LTD.,                :

TIME WARNER, INC.,             : C O N F I D E N T I A L

ICQ, INC.                      :

INSTALLSHIELD SOFTWARE CORP.,  :

and                            :

SCANSOFT, INC.                 :

           Defendants.      :

- - - - - - - - - - - - - - - X

               Reston, Virginia

            Tuesday, September 20, 2005

       Deposition of DANIEL GLAZMAN, a witness

herein, called for examination by counsel for the

Defendants RED BEND SOFTWARE, INC., RED BEND, LTD,

TIME WARNER, INC., ICQ, INC. and INSTALLSHIELD

SOFTWARE CORP., in the above-entitled matter,

pursuant to notice Fed.R.Civ.P.30(b)(6), taken at

the offices of Greenblum & Bernstein, P.L.C., 1950

            REF: 78627

16

CONFIDENTIAL

1  application.

2          Q    At the lawyers' office?

3          A    At the lawyers' office, those have to do

4  with the patent application.

5          Q    Does BIS have an office in Jerusalem as

6  well?

7          A    No.

8          Q    That office is closed?

9          A    It is closed.

10          Q    I take it there are no files in the office

11  in Jerusalem?

12          A    No.  Someone else is using the space.

13          Q    Is there a U.S. office of BIS?

14          A    No.

15          Q    Does BIS have any office other than the

16  Tel Aviv office?

17          A    No.

18          Q    Do you know whether anyone gathered the

19  documents that were at the accountants' office in

20  response to the document requests?

21          A    What was the question?

22          Q    Did anyone -- let me back up.

23          I think you said that there were hard copy

24  documents at the accountants' office; is that correct?

25          A    Right.

CONFIDENTIAL

1    Q    Did anyone gather documents from the
2    accountants' office in response to the document
3    request?

4    A    Yes.  The accountant was requested to
5    gather documents to take.

6    Q    Who asked the accountant to gather
7    documents?

8    A    Moti Miron.

9    Q    Do you know what the accountant was asked
10   to gather?

11   A    All the documents that were referred in
12   the request for disclosure.

13   Q    Do you know what type of documents the
14   accountant provided in response to the request?

15   A    All types of financial documents.

16   Q    When you say all types of financial
17   documents, what do you mean?

18   A    Annual reports, you have tax reports,
19   savings, all this type of stuff.

20   Q    Were the patent lawyers asked to provide
21   their files?

22   A    Yes.

23   Q    Who asked the patent lawyers to provide
24   the files?

25   A    Also Moti.

CONFIDENTIAL

BY MS. FERNANDS:

1

2      Q    Is there a hard copy file for each BIS

3 customer?

4      A    Yes.

5      Q    Were those files gathered in response to

6 the document request?

7      A    As far as research.

8      Q    Do you know if documents from files were

9 produced?

10      A    Everything searched and found was sent to

11 our attorneys.

12      Q    When you say everything was sent to the

13 attorneys, everything that was in the files?

14      A    Everything that was found was sent.

15 Everything responsive to these questions that was

16 found was sent.

17      Q    Did you search the hard copy customer

18 files?

19      A    Me or a representative?

20      Q    Did you personally, let's ask that one

21 first?

22      A    I personally didn't search the client

23 files.

24      Q    Was that Mr. Miron or Mr. Leave?

25      A    They searched.  Maybe it was a helper or

22

CONFIDENTIAL

1   secretaries.

2          Q    Do you know who determined what was

3   responsive so that -- who decided what to send to the

4   attorneys?

5          A    Miron, they do the search.

6          Q    So Mr. Miron or Mr. Leave decided which

7   documents to send to the attorneys in response to the

8   requests; is that correct?

9          A    What I said is what was sent was what was

10  found.

11         Q    I'm just trying to make sure I understand

12  they sent what they found.  Did they send all of the

13  documents or did they make a decision about what

14  documents to send?

15         A    Every document that is responsive to one

16  of the questions was sent.

17         Q    So they made a determination about what

18  was responsive and sent those documents that they felt

19  was responsive; is that correct?

20         A    You are asking me their state of mind,

21  what is their state of mind.

22         Q    Well, I'm just trying to understand if

23  Mr. Miron and Mr. Leave went to these hard copy files

24  on the shelves and saw a customer file did they pick

25  up the file and say copy it and send it to the

25

CONFIDENTIAL

1  their computer network?

2          A    The computer contents has a file server

3  and this file server is backed up to a magnetic media

4  or optical media.

5          Q    How often is the backup done?

6          A    Twice a week, once a week.

7          Q    Once or twice a week?

8          A    Yes.

9          Q    The backups, you said, magnetic media or

10  optical media?

11          A    It switched.  We switched to optical

12  media.

13          Q    How recently?

14          A    A few months.

15          Q    When you were using magnetic media, did

16  you reuse the tapes periodically?

17          A    Tapes are reused.

18          Q    How often are the tapes reused?

19          A    Backups may be kept for three to six

20  months.

21          Q    And then after three to six months they

22  would be recycled and used to back up again; is that

23  correct?

24          A    Yes.

25          Q    Are historic versions of the software kept

CONFIDENTIAL

26

1   on the network?

2        A    No.

3        Q    No?  Are there multiple versions of

4   Transfast?

5        A    Were there multiple versions?

6        Q    Have there been more than one version of

7   Transfast?

8             MR. FINK:  I'm going to object.  I

9   think that is beyond the scope of this deposition.

10            MS. FERNANDS:  To the extent I'm trying

11  to find out if those versions are stored, I'm trying

12  to find out if there --

13            MR. FINK:  You asked if historic

14  versions were kept and he said no.  So --

15            BY MS. FERNANDS:

16       Q    Is only the most recent version of any BIS

17  software product kept on the network?

18       A    Once the version is kept, usually one

19  version is kept.

20       Q    The most recent version is kept?

21       A    (Nodding head).

22       Q    Are historic versions kept anywhere?

23       A    To keep other versions, we don't keep

24  other versions of the software, it's just to keep them

25  as historical versions.

27

CONFIDENTIAL

1      Q    You --

2      A    I don't keep versions, historic versions.

3      Q    You don't keep historical versions at all?

4      A    No.

5      Q    If a modification is made to the software,

6  then the old version is lost?

7        MR. FINK:  Again, I think this is

8  beyond the scope of the deposition.

9        MS. FERNANDS:  I would think it is well

10  within the scope to determine whether there are old

11  versions of the software in existence anywhere.

12        MR. FINK:  You can ask him that.

13        BY MS. FERNANDS:

14      Q    Are there any old versions of any BIS

15  software in existence?

16      A    No.

17      Q    No?

18      A    No.

19      Q    Is the software, the current version of

20  the software, kept on the network or somewhere else?

21        MR. FINK:  Object to the form.

22        THE WITNESS:  The current version --

23  the version, work is kept in the file server.

24        BY MS. FERNANDS:

25      Q    It's kept on the file server?

29

CONFIDENTIAL

1    code?

2         A    Source codes and executable.

3         Q    So when executable is delivered to a

4    customer, do you keep a version of what is sent to the

5    customer?

6         A    The distribution, we are in touch with the

7    customers and created from them and this is kept

8    almost up to date with the current version.  It could

9    be one or two months older because the current version

10   is not fully tested, but otherwise, I don't have older

11   versions.

12        Q    I just want to make sure I understand.

13   You keep up with the customer frequently and so the

14   customer would have either the newest or close to the

15   newest version; is that correct?

16        A    Almost it is always the newest.

17        Q    Do the customer files contain a disk of

18   the software that has been sent to the customer?

19             MR. FINK:  Objection.  I think that's

20   beyond the scope of the deposition as well.

21             MS. FERNANDS:  I'm trying to find out

22   what is in the files that were searched and I think

23   it's within the scope.

24             MR. FINK:  You're asking what is sent

25   to the customers.  You can ask whatever was at BIS.

32

CONFIDENTIAL

1    A    To see if it contained such data, it was

2    searched and was sent.

3    Q    Were each of the -- is it ten employees;

4    is that the right number?

5    A    What is?

6    Q    There are ten employees at BIS; is that

7    correct?

8    A    (Nodding head).

9    Q    Do the employees also store information on

10   their hard drives of their computers or is everything

11   on the network?

12   A    Everything that we do is backed up on the

13   network.

14   Q    Everything is on the network?

15   A    Everything we do excluding some things --

16   the work -- basically everything that they do, it's a

17   software, is backed up onto the server.

18   Q    Were all of the electronic -- did you or

19   Mr. Miron or Mr. Leave ask all of the employees to

20   search their files in response to the document

21   request?

22   A    I asked employees to do a computer search.

23   Q    Do you know whether Mr. Miron or Mr. Leave

24   searched all electronic files, even those created by

25   other employees?

33

CONFIDENTIAL

1      A      The search was done by the server and no

2   matter who it was created by.

3      Q      Do you know what criteria was used for the

4   search on the server?

5      A      They searched the folders and files to see

6   if it could have data, responsive data for these

7   questions, and afterwards an additional keyword search

8   was done using a bunch of keywords to find files that

9   may be responsive to these questions that somehow were

10  not found when looking into the folders manually.

11     Q      So I just want to understand.  They went

12  through the folders and made a judgment based on the

13  folders first; is that correct?

14     A      They looked through every folder to see

15  what may contain data and afterwards a second search

16  was done using a search engine using keywords.

17     Q      Do you know what the keywords were for the

18  search?

19     A      The keywords, we didn't stick to them,

20  were the QBU, QDL, the transfer, delta, signature, and

21  those were some of the keywords that were used.

22     Q      Do you know whether the names of the

23  defendants were searched in the keyword search?  For

24  instance, Red Bend, InstallShield, ICQ?

25     A      Those were the keywords that were

34

CONFIDENTIAL

1    searched.

2         Q    Are any of the files on the server

3    restricted in access, like password protected?

4         A    No.

5         Q    So the search would cover everything that

6    was on the server?

7         A    Yes.

8         Q    I think you said the backup disks, when

9    you were using magnetic media, were recycled every

10   three to six months; is that correct?

11        A    Yes.

12        Q    So is it correct there are no backup disks

13   in existence from the 1998/1999 time period?

14        A    No.

15        Q    Did someone look through the backup disks

16   to see if there were any old backup disks that still

17   existed?

18        A    Those magnetic media which was backed up

19   was recycled.

20        Q    Are any -- well, does BIS still have any

21   of the magnetic media disks at BIS?

22        A    To the best of my knowledge, no.

23        Q    When did you switch to the optical media?

24        A    A few months ago.

25        Q    So up until a few months ago were there

35

CONFIDENTIAL

1  magnetic media disks at BIS?

2          A    Magnetic media tape cartridges.

3          Q    What happened to those cartridges?

4          A    I think they weren't kept because -- we

5  kept them a long time -- it was the back and forth was

6  designed to be kept.  We kept for a long time, so it

7  was a few months and as a result, they weren't kept.

8          Q    Did anyone look at the backup disks in

9  connection with responding to the discovery requests?

10          A    The backup disks, they were not searched.

11          Q    Who is responsible for maintaining the BIS

12  web site?

13              MR. FINK:  Objection.  I think that's

14  beyond the scope of the deposition.  Where would

15  that come under?

16              BY MS. FERNANDS:

17          Q    Does anyone -- does somebody maintain the

18  BIS web site?

19              MR. FINK:  Objection.  Where does

20  that --

21              MS. FERNANDS:  Well, it comes under the

22  web site that contains information that is

23  responsive and I would like to know if there are any

24  historic versions of it, so if someone maintains it,

25  that will let me know the answer to that question

37

CONFIDENTIAL

1      A    If there was such in the files, they were

2    found, it was sent.

3           Q    So, for instance, any prior contents to

4    the web site has not been kept electronically anywhere

5    at BIS?

6           A    No.

7           Q    What does BIS use for an E-mail system?

8           A    We have a server.  And UNIX.

9           Q    UNIX server?

10          A    Yes.

11          Q    Is it the case that E-mails are retained

12   electronically at BIS on a server, did you say?

13          A    Yes.

14          Q    The E-mails are kept electronically?

15          A    Yes.

16          Q    They are not printed out and stored?

17          A    It depends.  It's either that or

18   computers.

19          Q    If an E-mail in gathering documents in

20   response to the request, were attachments to E-mails

21   gathered?

22          A    Yes.

23          Q    Is it the case in the UNIX server that if

24   an E-mail has an attachment that the attachment also

25   still exists?

43

CONFIDENTIAL

1    10:56 a.m. and then the proceedings continued as

2    follows at 11:05 a.m.)

3           (Whereupon, Paralegal Leiba Leichtner

4    entered the room.)

5           BY MS. FERNANDS:

6    Q    I just want to go back a little bit to who

7    had which responsibilities in the document gathering.

8    If I have it, there were three of you who

9    participated:  You, Mr. Miron and Mr. Leave; is that

10   correct?

11   A    And probably Mr. Miron and the other

12   secretary.

13   Q    And you were responsible for the technical

14   documents; is that correct?

15   A    Yes.

16   Q    What did you do to search for technical

17   documents?

18   A    I was on the server and any part of the

19   software and part of the source, the executable, any

20   documents that were related to this, if there is some

21   description, some memo inside the software,

22   everything.  Anything to do with the...

23   Q    When you say the software, what are you

24   referring to?

25   A    The QDL, QBU and TransFast.

44

CONFIDENTIAL

1   Q    Why did you search in QDL, QBU and

2   TransFast?

3          MR. FINK:  I'm going to object.  I

4   think that's going beyond the scope of the notice.

5   You can ask where they searched.  Why they searched?

6          BY MS. FERNANDS:

7   Q    Let me go back and we'll get back around

8   to that.

9          Did you provide executable code for QDL,

10  QBU and TransFast to the attorneys?

11  A    What was called the search project, it

12  includes the executable source and all the support

13  that you need for software development.

14  Q    Did somebody tell you to search the QDL,

15  QBU and TransFast in connection with the document

16  requests?

17         MR. FINK:  I'm going to object to the

18  extent that he was instructed to do so by counsel.

19  Other than counsel told you to look at them, you can

20  answer.

21         THE WITNESS:  The QDL and QBU and

22  TransFast, this was products that were covered by

23  the patent or in some way related or referring to

24  the patent description.

25         BY MS. FERNANDS:

45

CONFIDENTIAL

1    Q    So if I understand, BIS has other products

2    interest and -- I've forgotten the other name, you did

3    not search any other software; is that correct?

4    A    No.

5    Q    And is that because they do not practice

6    the 239 patent invention?

7    A    It did not concern it in any way and

8    having nothing to do with this.

9    MR. FINK:  I'll object to that question

10    to the extent that it requires a legal conclusion.

11    BY MS. FERNANDS:

12    Q    Other than searching the technical files,

13    did you personally search any of the files in

14    connection with the document requests?

15    A    I personally sent for the gathering of all

16    of this and did not make any other searches.

17    Q    You did not make any other searches?

18    A    No.

19    Q    Do you know which files Mr. Miron

20    searched?

21    A    He searched on his computers and on the

22    file server.

23    Q    Does Mr. Miron keep files on his personal

24    computer that are not on the network?

25    A    The main computer, the mail is kept on his

46

CONFIDENTIAL

1    personal computer, was searched.

2         Q    You said the mail is kept on his personal

3    computer.  Is Outlook not networked?

4         A    The Outlook we are using is not networked.

5    The mail is kept on the individual computer.

6         Q    So each employee's Outlook would have to

7    be searched on their individual computer to search it;

8    is that correct?

9              MR. FINK:  Objection to the form.

10             BY MS. FERNANDS:

11        Q    Is it possible to search the Outlook

12   E-mail files for every one within BIS from the

13   network?

14        A    For the network itself, if Outlook is

15   keeping files on the individual computers, you must

16   search on his file on his computer.

17        Q    And is that the case that Outlook BIS

18   keeps files on only individual computers?

19        A    Yes.

20        Q    Was each employees individual computer

21   searched to determine if they had E-mail in Outlook

22   that was responsive to the requests?

23        A    I didn't ask them if other computers were

24   searched.  I didn't ask.

25        Q    When you say you didn't ask them, that's

47

CONFIDENTIAL

1   Mr. Miron and Mr. Leave?

2       A    I did not ask Mr. Miron and Mr. Leave if

3   they did search all the computers.

4       Q    Do you know whether the other computers

5   were searched?

6       A    I didn't ask them if they did an

7   individual search, so I don't know if they were

8   searched.

9       Q    Are there other types of files, computer

10  files, that are only accessible on individuals

11  computers at BIS?

12      A    Not all the files like software was

13  working.  All of this is backed up on the file server.

14      Q    You said all --

15      A    The software project and stuff,

16  everything, is backed up on the file server.

17      Q    All of the software project files are

18  backed up?

19      A    All of the projects, except for the

20  working copy for this week or these two weeks,

21  everything is backed up on the server.

22      Q    Is the working copy stored on an

23  individual computer or is it also on the network?

24      A    A working copy is kept on the working

25  computer, but it is mainly after a week, two weeks,

48

CONFIDENTIAL

1  maximum, it's backed up on to the file server.

2      Q    For instance, are Power Point

3  presentations kept on individual computers or are they

4  backed up?

5      A    They are on the file server.  I mean, a

6  pure software project, you take the software project

7  and they're working on it, if it's a working copy on

8  the individual computers, then it is copied back to

9  the server.

10     Q    So I just want to make sure I understand.

11  There are working copies of certain documents on

12  individual computers but --

13     A    I mean the software project.  It's not

14  practical to be working on a software project to make

15  tests when he this is using the file server.  It's not

16  a practical thing to do.

17     Q    But when you say the software project,

18  what types of files do you have in mind?

19     A    To work with the source files, to make the

20  computer, you can test them, but it's not practical to

21  do it on a file server.

22     Q    So when you talk about the software

23  project files, you're talking about the executable

24  code, the source code?

25     A    You put everything in code and put

49

CONFIDENTIAL

1    everything together to make it a piece of working

2    software.  On a software project there is a source

3    code, there is the executable and control files that

4    are needed to make it work together.

5            Q    Are there also documents, Word documents,

6    for instance, that describe the software?

7            A    A few of them and part of them are with

8    the source code and some are kept on the server.

9            Q    Word documents describing the software are

10   stored with the source files?

11           A    Not everything, but software, if it does

12   exist, it is with the source files, and so it also

13   goes to the same process that it was sent.

14           Q    So those would all be within the network

15   server?

16           A    Say?

17           Q    Any files of that nature, a Word file

18   describing the software, would be in the network

19   server?

20           A    If some piece of the software needs some

21   more explanation, if it's a text file or document

22   files or similar text files along with the software,

23   as long as it's software.

24           Q    So you're referring to explanation within

25   the code so that programers can understand?

50

CONFIDENTIAL

1    A    Sometimes there are additional files in

2    addition to the source files, but it is together with

3    the source files in the same folder.

4    Q    What about descriptions that are, for

5    instance, a presentation to a customer describing the

6    software; how are those kept?

7    A    This is complicated -- it is completely

8    separated on the software projects.  The presentations

9    are kept on the file server, Power Point files,

10   whatever it would be and a file server or sometimes in

11   the computer are kept and then all of this is

12   searched, the computer for the software itself.

13   Q    So you have the software projects on the

14   server and then separate from the software project

15   files but also on the server there are presentations;

16   is that correct?

17   A    Exactly.  And there are presentations on

18   numerical computers and it was also searched, the

19   other computers with the software was also searched.

20   Q    So Mr. Miron's computer was also searched

21   and he could have presentations?

22   A    Any presentations that were on his

23   computer were found and sent.

24   Q    Is there anyone else in the company who

25   might have presentations on their personal computer?

54

CONFIDENTIAL

1    A    His name --

2         MR. FINK:  Wait, wait, wait.  I think

3    that's going beyond the scope of this deposition as

4    well.

5         BY MS. FERNANDS:

6    Q    Do you know was the marketing persons

7    personal computer searched?

8    A    As I said before, I didn't ask Moti and

9    Mr. Leave if this computer, was it searched.  As I

10   said before, I didn't ask Mr. Miron or Mr. Leave if

11   they asked other employees to search their computers.

12   Q    You don't know whether the marketing

13   person's computer was searched?

14   A    I didn't ask them if it was searched or

15   instructed the employees to search it.

16   Q    You're aware of the patent that we've been

17   calling the 239 patent; is that correct?

18   A    Excuse me?

19   Q    You know that this case involves something

20   called the 239 patent, right?

21   A    Right.

22   Q    Do you know if files concerning the 239

23   patent were looked for in response to the document

24   request?

25        A    We looked for hard copy files and they

63

CONFIDENTIAL

1      BY MS. FERNANDS:

2          Q     Do you know when Mr. Miron searched his

3      home computer in response to --

4          A     I didn't ask him if he has files in his

5      computer so, of course, I didn't ask him if he

6      searched his computer.

7          Q     Do you know whether there is any version

8      source code or executable code still in existence from

9      1998 for TransFast?

10             MR. FINK:  Objection.  Asked and

11     answered.

12             THE WITNESS:  In keeping current

13     versions of the software some pieces of -- some

14     parts of the software that were obsolete for a long

15     time for a current version might be quite old, so by

16     keeping the current version of the software so --

17     and the current versions were submitted.

18             BY MS. FERNANDS:

19         Q     Is it possible to tell from the source

20     code how old various portions of the code are?

21             MR. FINK:  Objection.  I think that

22     goes beyond the scope of the deposition notice.

23             MS. FERNANDS:  Are you going to

24     instruct him not to answer?

25             MR. FINK:  Tell me what your number is

64

CONFIDENTIAL

1    and I'll tell you whether or not he's going to

2    testify on that.

3            MS. FERNANDS:  I think it certainly

4    goes to the retention of materials generally whether

5    current version -- you can tell from current

6    versions what their origin is.

7            MR. FINK:  It's about retention

8    policies.  It has nothing to do with determining

9    whether a specific document is a specific version.

10   I think that's beyond the scope of the deposition

11   and he's not designated to testify.

12           MS. FERNANDS:  Can he answer the

13   question?

14           MR. FINK:  No.

15           MS. FERNANDS:  Are you instructing him

16   not to answer?

17           MR. FINK:  Uh-huh.  You've already

18   asked whether they maintain such files.  He's told

19   you no.

20           BY MS. FERNANDS:

21       Q    Do you know whether Mr. Miron has

22   personally retained any older versions of the

23   software?

24       A    I asked this but the software is not

25   Mr. Miron's responsibility, so versions of the

65

CONFIDENTIAL

1   software are not kept on his computer.

2        Q    Was there a search for all documents

3   concerning the design and development of the TransFast

4   software?

5        A    The keyword search was done and this

6   keyword search included the TransFast keyword which

7   was one of the searched keywords so if there was any

8   documents corresponding to this, they were found and

9   submitted.

10        Q    Did you do that search for TransFast or

11   was that Mr. Miron or Mr. Leave?

12        A    That was Mr. Leave.

13        Q    Do you know what types of documents exist

14   concerning TransFast?

15        A    It could be documents, it could have been

16   some presentation documents.  But everything that was

17   found containing TransFast in keyword was submitted.

18        Q    And Mr. Miron and Mr. Leave told you that

19   everything that they found for the keywords was sent

20   to the lawyers?

21        A    Yes.

22        Q    Is that the same for QBU?

23        A    The same for QBU and QDL.

24        Q    Did Mr. Miron tell you that they had

25   searched for all documents concerning his original

67

CONFIDENTIAL

1  software that embodies the patented information.

2  Why don't you just ask about specific products?

3  It's an improper question.  He can't answer it.

4      BY MS. FERNANDS:

5      Q   Do you know whether there were any

6  prototype or beta software projects related to the

7  invention described in the 239 patent?

8      A   The project is something using QDL and QBU

9  is a project that is using this patent.

10      Q   Prior to QDL and QBU, were there any

11  earlier versions or perhaps not even named, those that

12  practiced the invention that is described in the 239

13  patent?

14      MR. FINK:  Objection.  It goes way

15  beyond the scope of this deposition.  He's not

16  designated to testify to that.

17      BY MS. FERNANDS:

18      Q   Do you know whether there is -- actually,

19  I think it's well within the scope, but do you know

20  whether there are any early beta or prototype versions

21  of QDL or QBU in existence?

22      A   I don't understand exactly your question.

23      Q   Do you know if -- QDL and QBU are

24  commercial products, correct?

25      A   Right.

74

CONFIDENTIAL

1    the hard copy files in our office or patent lawyer

2    office, all these documents were searched for for

3    anything that can be a responsive document for this.

4          Q    And your understanding is Mr. Miron and

5    Mr. Leave searched for any documents that were

6    responsive to the request?

7          A    Yes.

8          Q    Do you know whether they limited what they

9    provided to the lawyers based on their judgment that

10   it wasn't responsive or that it was something that

11   was based on their judgment that it wasn't responsive?

12         A    To my best knowledge what they found, they

13   submitted.

14         Q    When you say what they found it was

15   submitted, do you know if they made a cut of the

16   documents based on their judgment this is responsive,

17   this is not responsive?

18         A    I know what to ask them, they submitted

19   everything, no one did this thing, this was responsive

20   to this, let's cut here, let's cut there.

21         Q    Do you know whether the documents that

22   were located included any documents about Red Bend or

23   Red Bend Software?

24         A    I didn't ask what was actually found, but

25   what was searched, how it was searched, what was the

81

CONFIDENTIAL

1   answered.

2          THE WITNESS:  If there is a search,

3   keyword transfer, you find the document, the

4   document was sent.

5          BY MS. FERNANDS:

6      Q    And the projects file for TransFast was

7   also sent to the attorneys?

8      A    The software project that contains all the

9   files that are needed for this project, it includes

10  source files, executable, control files to put

11  everything together, all this was submitted.

12     Q    Do you know whether there was a search for

13  documents concerning any claim or challenge to the

14  validity of the 239 patent?

15     A    Again, these documents --

16         MR. FINK:  I'm going to object to the

17  line of questioning.  He's already testified that

18  they searched each and every request that defendants

19  propounded and whatever they located, they

20  submitted.  So are you going to take him through

21  each and every request?  This is a complete waste of

22  time.

23         MS. FERNANDS:  First, objection would

24  be sufficient to a speaking objection that isn't

25  necessary, but I would like to explore the document

82

CONFIDENTIAL

1    request that is, in fact, a subject of this

2    deposition, is a search for a gathering of documents

3    in response to these requests and to the extent that

4    some are different than others, I don't believe it's

5    a waste of time, I think it's perfectly appropriate.

6                 MR. FINK:  I think there was a

7    question.

8                 THE WITNESS:  These documents were

9    searched of the file, all the documents that are

10   related to the patent or have copy of documents kept

11   here, documents were kept with the office at the

12   patent application, all these files were searched

13   and such documents were found and submitted.

14                BY MS. FERNANDS:

15        Q     If such documents were found, they were

16   submitted?

17        A     Yes.

18        Q     Was there any attempt to look for articles

19   or conference papers concerning -- of any form

20   concerning the 239 patent?

21        A     What type of papers?

22        Q     Articles or was the invention ever

23   presented at a conference or at an industry event,

24   anything of that nature, was there --

25                MR. FINK:  I'm going to object to the

86

CONFIDENTIAL

1   applications related to the invention in the 239

2   patent?

3          MR. FINK:  I'm going to object.  I

4   think that goes beyond the scope of this deposition.

5          MS. FERNANDS:  Certainly the custodian

6   of records is responsive to the document request.

7          MR. FINK:  So you're asking if he is

8   aware of any foreign patent associates; is that what

9   you're asking?

10         MS. FERNANDS:  I'm asking if he's aware

11  of any other location of documents responsive to the

12  document request --

13         THE WITNESS:  No.

14         BY MS. FERNANDS:

15     Q    -- such as foreign patent applications

16  that are non-U.S. patent applications?

17     A    Not that I know of.

18     Q    Do you know whether anyone, whether

19  Mr. Miron or Mr. Leave, asked -- looked into whether

20  there are other locations of documents concerning

21  non-U.S. applications for the inventions described in

22  the 239 U.S. patent?

23     A    As I told you before, I didn't ask him did

24  he keep files at home or did he keep files on the home

25  computer.

88

CONFIDENTIAL

1   computer, it is a product, you do something like

2   Delta, it would come up in the search because Delta

3   was one of the search keywords.

4           MR. FINK:  Go off the record a second.

5           MS. FERNANDS:  Let's go off the record

6   a second.

7           (Discussion off the record.)

8           (Whereupon, a luncheon recess was taken

9   at 12:17 p.m. and then the proceedings continued as

10  follows at 1:09 p.m.:)

11          MR. FINK:  When we broke for lunch we

12  discussed certain issues that we were going to

13  contact Israel to see if we could obtain additional

14  information, specifically we wanted to know if Moti

15  Miron kept any files at home and also about his

16  computer and you wanted to know if any of the other

17  employee's computers were searched and also about

18  foreign files and Danny's going to tell you what he

19  learned.

20          MS. FERNANDS:  Okay.  Why don't we go

21  piece by piece?

22          BY MS. FERNANDS:

23      Q    You were able to contact someone at lunch

24  then, I take it, to learn the answers to some of these

25  questions?

89

CONFIDENTIAL

1    A    Right.

2    Q    What did you learn about whether Mr. Miron

3  has any files at home?

4    A    He doesn't keep any hard copy files at

5  home.

6    Q    And does he keep anything on his personal

7  computer at home?

8    A    He said he has a laptop so it's actually

9  the same computer at the office as at home.

10    Q    So he doesn't have any hard copies and the

11  computer is the same so there are no additional files;

12  is that right?

13    A    Right.

14    Q    And what about individual computers of

15  other employees; were those searched?

16    A    The computer, the one responsible for

17  marketing, was searched.  The person wasn't there but

18  the computer was searched for everything including all

19  the E-mail files, including the secretary has

20  multicomputers that were searched and the server was

21  searched and everything that was found was the same

22  searching, the attempts to search, keywords were

23  submitted.

24    The computers of the programers were not

25  searched because we have no reason to believe data --

90

CONFIDENTIAL

1    unresponsive data would be found there.

2         Q    Do the programers ever have contact with

3    the customers?

4         A    Only about issues like error reporting

5    going back and forth and this is usually not kept for

6    a long time.

7         Q    Do you know whether the programers ever

8    keep older versions of the software on their own

9    computers?

10        A    To my best knowledge, no.  And also we

11   don't keep older versions, so not as to get confused,

12   so we keep the current working version.

13        Q    But you don't know whether the programers

14   keep any older versions on their old computers?

15        A    To my own knowledge they don't keep.

16        Q    Were you able to learn anything about

17   non-U.S. patent applications?

18        A    The office who do the patent application

19   was requested to send all of the files that were and

20   also files were photocopied and sent to BIS.

21        Q    I'm sorry.  I don't think I caught that.

22   What was that?

23        A    The law office, Eitan Pearl, if there was

24   a patent application was asked to provide a copy, all

25   of the documents related to this and this was

91

CONFIDENTIAL

1  submitted as is.  And this includes any documents in

2  this category which were searched.

3      Q    Did you determine whether there was anyone

4  other than the Eitan group involved in any non-U.S.

5  applications who might have documents?

6      A    Any documents, they should be with the

7  Eitan law office, because BIS didn't contact the law

8  office about those applications.  So if any was

9  involved, it was in the patent office and they should

10 have all the documents.

11     Q    Did Mr. Miron review the documents that --

12 well, did the Eitan provide documents directly to

13 attorneys or were they sent to BIS?

14     A    It was sent to BIS and the entire file was

15 sent to Mr. Leave.

16     Q    Did Mr. Miron review it before sending it?

17     A    No.  It was sent as is.

18     Q    So you don't know whether it included any

19 non-U.S. applications that were in the file?

20     A    Personally I don't know, but if there was

21 anything like this, anything like this existed, these

22 files were sent.

23     Q    Do you know whether Mr. Miron knows

24 whether there were non-U.S. applications within the

25 file?

92

CONFIDENTIAL

1      A      I didn't ask specifically about this, but

2  everything that was in the file was submitted, so it

3  should include this and if any such documents were

4  there, they were included.

5      Q      But you didn't review the file so you

6  don't know what was in the file; is that correct?

7      A      I didn't review.  The file was sent as is

8  with the other files.  I do not know what was in the

9  files.

10      Q      With respect to the individual computers,

11  were the Outlook folders searched on those computers

12  when they were searched -- I guess you said only the

13  marketing person's?

14      A      Yes.

15      Q      Only that marketing person's was.  The

16  marketing person's Outlook folder was searched?

17      A      It was searched as part of the entire

18  computer.

19      Q      And if I'm correct that Outlook is not

20  networked, so it's not saved to the file server with

21  the file server; is that correct?

22      A      The computer is not networked, but it was

23  searched independently for that.

24      Q      Is everything that is networked stored on

25  the backup disks when a backup is made?

98

CONFIDENTIAL

1    A    There was no instruction to all employees,

2    no.

3    Q    Was there an instruction to any employees

4    not to destroy documents?

5    A    I'm not aware of such thing.

6    Q    Do you know whether any documents have

7    been destroyed since September of 2004?

8    A    No.

9    Q    Do you know whether anyone at BIS,

10   excluding attorneys -- I'm not interested in what

11   attorneys were instructed to do or told BIS about.  Do

12   you know whether anyone at BIS did a search for

13   competitive products or prior inventions before the

14   239 patent?

15   A    Inside of BIS?

16   Q    Inside of BIS, yes.

17   A    I don't know.  Nope.

18       MR. FINK:  I don't know if you're going

19   to pursue this questioning, but I think it's going

20   beyond the scope of the deposition.

21       BY MS. FERNANDS:

22   Q    Are there any documents at BIS concerning

23   any prior inventions or any competitors that existed

24   prior to the invention that's described in the 239

25   patent?

108

CONFIDENTIAL

1      A    I think it was long enough to change so
2   the question is irrelevant.
3      Q    The current marketing person has only been
4   there a couple of months; is that correct?
5      A    Two months maybe.
6      Q    How long was the prior marketing person
7   there?
8           MR. FINK:  I'm going to object.  I
9   think you're going beyond the scope of the
10  deposition again.  You can answer if you know.
11          THE WITNESS:  I don't know.  A
12  year-and-a-half, two years.
13          BY MS. FERNANDS:
14     Q    Was there a marketing person before that
15  who had documents concerning sales and marketing?
16     A    I think so.
17     Q    Who was responsible for marketing before
18  the marketing person who was there for about a year to
19  a year-and-a-half?
20     A    No one.
21     Q    Mr. Miron took care of the marketing
22  himself?
23     A    Yes.
24     Q    Do you know whether in searching his files
25  Mr. Miron located documents concerning sales or offers

CONFIDENTIAL

115

1   is that the person who would have control over

2   documents concerning marketing plans?

3           A    Many of the documents are prepared by

4   Moti.

5           Q    So Mr. Miron continues to prepare

6   marketing plans as well?

7           A    Well, he continues and you asked me the

8   scope of this, but the marketing person is more to

9   local customers, search for them, contact them, okay,

10  we have this and this, can I send you these documents,

11  so now this is Moti producing the documents.

12          Q    So Mr. Miron has the responsibility for

13  actually writing the marketing documents; is that

14  correct?

15          A    If you're a marketing person two months

16  into the job, it's impossible for you to provide

17  documents.

18          Q    Did the prior marketing person provide

19  marketing documents?

20          A    Most of them are prepared by Moti, but,

21  again, he would -- the day-to-day work was contact the

22  customers, follow-up and things like this.

23          MR. FINK:  Can we get back to the scope

24  of the deposition?

25          BY MS. FERNANDS:

117

CONFIDENTIAL

1    beyond the scope of the deposition.

2            BY MS. FERNANDS:

3        Q    Do you know whether there was a search

4    conducted for any documents that would show any

5    diagrams or specifications for the TransFast product?

6        A    These documents in presentation or

7    marketing is not different from any other market

8    presentation document, so if it's a Power Point show

9    that describes it, it would show up in the search.

10       Q    Do you know whether any such documents did

11   show up in the search?

12       A    Again, I don't know about the specific

13   context of the search.

14       Q    Would that be Mr. Miron and Mr. Leave who

15   would know if documents --

16       A    They did -- they performed the search

17   so...

18       Q    When you spoke with Mr. Miron and

19   Mr. Leave before your deposition, did you ask them

20   what types of documents had been provided to the

21   attorneys?

22       A    I asked them, according to this one

23   (indicating) what was searched and how it was

24   searched.  I didn't ask for specific type of

25   documents.

122

CONFIDENTIAL

1  that I get.

2      Q    In response to the E-mails about the

3  problem -- let me back up.

4          Did the E-mails about the problem address

5  the functionality of the products?

6          MS. FERNANDS:  Objection.  You're

7  beyond the scope of the deposition again.

8          THE WITNESS:  Such messages, I get this

9  error message on the computer, a screen message or

10  error message, I did the backup and for some reason

11  I cannot locate it now or I cannot restore it, these

12  are the questions.  This is from the person who is

13  using the product.

14          BY MS. FERNANDS:

15      Q    Do the programs correspond by E-mail

16  concerning the development of the products?

17      A    We have some meetings, we discuss it and

18  usually, no, no such E-mails.

19      Q    Do they ever correspond by E-mail about

20  development?

21      A    Usually not.  We sit in the same room, or

22  just in rooms and meet, if you need something, you go

23  in between.

24      Q    Did the programmers create any documents,

25  list -- task lists for development or other

128

CONFIDENTIAL

1      Q    Earlier you testified about certain backup

2   tapes; is that correct?

3      A    Uh-huh.

4      Q    Was the purpose of those backup tapes for

5   archival purposes?

6      A    No.

7      Q    What was the purpose of the backup tapes?

8      A    The purpose of these backups was to

9   provide recovery in case the server is broken, damaged

10  or anticipated recovery.

11     Q    To the best of your knowledge, are there

12  any files on the backup tapes which are not still on

13  the file server?

14     A    No.

15         MR. FINK:  That's all I have.

16         MS. FERNANDS:  I actually have one

17  follow-up question on that.

18     FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANTS

19         BY MS. FERNANDS:

20     Q    With respect to the continuous -- the

21  updating of versions of software, the backup tapes

22  have the version as it existed at the time of the

23  backup tape and not the current version?

24     A    The backup contains any files as it

25  existed at the time of backup.